NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 15a0543n.06

Case No. 14-5990

**FILED**
Jul 30, 2015
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| SHERYL BRUNER, | ) | KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | OPINION |
| | ) | |

BEFORE: BOGGS and DONALD, Circuit Judges; QUIST, District Judge.[*]

**BERNICE BOUIE DONALD, Circuit Judge.** A jury convicted Defendant-Appellant

Sheryl Bruner ("Bruner") of fourteen counts involving bankruptcy fraud, money laundering,

Social Security fraud, making a false statement, and theft of government money. Between 2003

and 2013, Bruner fraudulently collected Social Security income by making false statements that

she was unable to work and by concealing her income and assets. Bruner also made false

declarations when she filed for bankruptcy and subsequently engaged or attempted to engage in

several financial transactions with the proceeds from her bankruptcy fraud. At trial, Bruner

relied on an advice-of-counsel defense, wherein she alleged that the false declarations she made

on her bankruptcy petition were the result of advice she received from her attorneys. The district

---

[*]The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by
designation.

court denied Bruner's request for a jury instruction on her advice-of-counsel defense, and Bruner appeals her bankruptcy fraud and money laundering convictions based on that denial. Because we find the district court did not abuse its discretion in finding that Bruner had failed to adduce sufficient evidence warranting an advice-of-counsel instruction, we **AFFIRM** Bruner's conviction and sentence on these charges.

## I.

## A.

For approximately ten years, Bruner fraudulently collected Supplemental Security Income ("SSI") by making false statements that her depression, anxiety, and obesity rendered her unable to work, and by concealing her income and assets. Specifically, Bruner failed to disclose to the Social Security Administration that she ran an in-home business that provided services to Medicaid patients; that she billed Medicaid for over $7.8 million between 2007 and 2013; and that she was paid, through a company she subcontracted with, $204,293 in 2012 and $119, 605 in 2013. Bruner also owned three homes and four vehicles.

On May 16, 2013, Bruner filed for bankruptcy and stopped making mortgage payments on her home at 233 Stable Way in Nicholasville, Kentucky—the one home she had reported to the Social Security Administration. In her bankruptcy petition, Bruner claimed to have only $1,500 in cash and investments, one home at 233 Stable Way, and $5,100 in personal property (including one vehicle she valued at $1,500). Among other things, Bruner failed to disclose her monthly SSI income and vastly underreported her business income. Further, Bruner falsely declared that she did not hold or control any property for anyone else and that, during the past ten years, she had not transferred any property into any trust that claimed her as a beneficiary.

On December 5, 2013, during an unrelated investigation into Bruner's Medicaid reimbursement claims, the Kentucky Attorney General's Office of Medicaid Fraud and Abuse Control Unit searched Bruner's home—also the address for her business—to obtain patient records. During this search, investigators discovered over $223,000 in cash that had been stored in a safe in an attic space behind a locked door in a bedroom closet.

The following day, December 6, 2013, Bruner wired $19,000 from her TD Ameritrade account to Town & Country Bank and Trust in Nicholasville, Kentucky, and withdrew the money in cash. On December 9, 2013, Bruner sent three more wire transfers to the Town & Country account and withdrew $3,240 in cash. Later that same day, Bruner attempted to wire and withdraw an additional $493,000, and Town & Country closed her account. The following day, December 10, 2013, Bruner opened an account at Central Bank in Lexington, Kentucky. From this account, Bruner continued to wire and withdraw cash, including a $153,000 wire on December 17, 2013, and a $25,000 cash withdrawal on December 24, 2013.

In the midst of these financial transactions, on December 20, 2013, Bruner attended a bankruptcy hearing with her bankruptcy attorney, Justin O'Malley ("O'Malley"). During this hearing, Bruner initially denied but then admitted to owning or being the trustee controlling two homes and three vehicles that she had not disclosed on her bankruptcy petition.

B.

On February 6, 2014, a grand jury indicted Bruner on fourteen counts: one count of theft of government money, in violation of 18 U.S.C. § 641; one count of concealment and failure to disclose assets, in violation of 42 U.S.C. § 1383a(a)(3); one count of making false and fictitious statements, in violation of 18 U.S.C. § 1001; one count of bankruptcy fraud/concealment of

assets, in violation of 18 U.S.C. § 152(3); and ten counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).[1]

A jury trial commenced on March 10, 2014. Bruner's counsel advised the district court on the second day of trial that Bruner intended to waive the attorney-client privilege and also intended to request that the court give an advice-of-counsel instruction and a good faith defense instruction to the jury. Defense counsel further indicated that "one of the determining factors in whether or not my client is going to decide to testify is whether we can present enough evidence to justify the giving of one of these instructions without her testifying." The district court subsequently secured a waiver of the attorney-client privilege from Bruner with respect to two attorneys: Bruner's trusts and estates attorney, William Legg ("Legg"), and Bruner's bankruptcy attorney, O'Malley.

Legg testified that as early as 2000, he placed Bruner's business and assets into several trusts, which she exclusively controlled as the grantor and trustee. Legg agreed that Bruner had "disclosed to [him] all the pertinent facts that [he] needed . . . in order to give her the advice that [he] gave her." Among other things, Legg advised Bruner that "property she placed into the trust was owned by the trust and not by her." Legg further agreed that Bruner appeared to be relying on the advice he gave her, as evidenced by notes Bruner had taken. Additionally, Legg acknowledged that Bruner had informed him that she had over $220,000 in cash in her home. Legg also agreed that when he spoke to Bruner after she had filed her 2013 bankruptcy petition, she told him that she had relied on advice from her bankruptcy lawyer in completing the petition.

---

[1] Bruner was initially charged with two counts of making false and fictitious statements. Prior to trial, however, Bruner moved to dismiss one of these counts as duplicitous. The government did not respond and did not include this charge in the verdict sheet completed by the jury. Post-trial, the district court granted Bruner's motion to dismiss. *United States v. Bruner*, No. 5:14-CR-5-KKC, 2014 WL 2921840, at *6 (E.D. Ky. June 27, 2014).

Following Legg's testimony, the government informed the district court of its opposition to Bruner's request for an advice-of-counsel instruction. After argument, the district court directed defense counsel to provide "some cases in terms of what the defendant must show before this instruction is given" and gave the defense "fair warning" that, "based on what [the court had] heard to date," the instruction was not justified.

The following day, as part of her defense, Bruner presented O'Malley's testimony. O'Malley testified that Bruner's principal concern was the effect filing bankruptcy would have on trusts that Bruner said she had established for the benefit of her infirm mother and disabled sister. Defense counsel and O'Malley had the following exchange:

Q. All right. And what did you tell her [in response to her concerns]?

A. Told her that as a general principle of law, property held in an irrevocable trust for the benefit of someone other than the debtor would not be deemed property of her bankruptcy estate.

Q. Did you tell her she did not have to disclose the trust in the bankruptcy petition?

A. I did not.

Q. Okay. Did you ask to look at the trust documents to see if in your opinion they were the type of trusts that might need—that might have to be disclosed?

A. I did not because this was our initial meeting prior to tendering any substantive materials, so my presumption was the thrust of her question was that trust[s] that were held exclusively by her mother and sister would not be impacted by her filing bankruptcy. So I understood the substance of her question to run not to her as a debtor but to her mother and sister in their assets.

Q. Okay. And that was the end of the discussion about the trust[s]?

A. Correct.

Q. Okay. Now . . . were you hired to represent her?

A. I was.

Q. Okay. And did you sit down with her and go over each question in the bankruptcy petition?

A. I did. I gave her an intake packet.

Q. Okay. Did you sit down with her and go over each question in the bankruptcy petition, or did you give her this intake packet?

A. I gave her the intake packet.

Q. Okay.

A. And . . . I provided [an] explanatory explanation of how to proceed through each section of that packet and conferred with her to make certain she didn't have any questions or concerns.

Q. All right. You went through what you put into your—in your intake packet?

A. Correct.

Q. How many pages is an intake packet?

A. Five pages of instructions and approximately 36 pages of substantive material, for a total of 42 pages, and it's written to mirror the schedules and the statement of financial affairs, which is required in any bankruptcy petition, irrespective of which chapter a debtor were to file under.

Q. Okay. I'm just trying to get at what is in the packet. Is it copies of the statement of affairs and statement of financial condition and the actual petition, or is it—is it your work product that reproduces the statements and schedules?

A. My work product that reproduces the statements and schedules.

Q. Okay. Did she fill it out there in your office?

A. She began filling it out and then completed it at home and mailed me the completed copy, along with the check to retain my services.

The defense rested without calling Bruner to testify. Without offering further argument or legal authority, defense counsel formally requested the advice-of-counsel instruction. The district court denied the advice-of-counsel instruction for lack of evidentiary basis, but did give an instruction on Bruner's good-faith defense.

The jury convicted Bruner on all fourteen counts. Bruner moved for a new trial, arguing that the district court erred in declining to give the advice-of-counsel instruction. The district court denied the motion. In a judgment entered on August 8, 2014, the district court sentenced Bruner to seven years of imprisonment. This timely appeal followed.

## II.

"We review a district court's decisions concerning whether to give a particular jury instruction for abuse of discretion." *United States v. Capozzi*, 723 F.3d 720, 725 (6th Cir. 2013) (quoting *United States v. Sloan*, 401 F. App'x. 66, 68 (6th Cir. 2010)). Under this standard of review, we may reverse a district court's denial only if the proposed instruction "is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *United States v. Franklin*, 415 F.3d 537, 553 (6th Cir. 2005) (internal quotation marks and citation omitted).

## III.

In asserting an advice-of-counsel defense, a defendant alleged to have performed a criminal act argues that she did so on her lawyer's advice, and therefore lacked the requisite mens rea element of the offense. *United States v. Swafford*, 512 F.3d 833, 839 (6th Cir. 2008); *see also United States v. Ragsdale*, 426 F.3d 765, 778 (5th Cir. 2005) ("The advice of counsel defense is only applicable where it may negate willful violation of the law.") To receive a jury

instruction for an advice-of-counsel defense, a defendant must offer evidence of "(1) *full* disclosure of all pertinent facts to counsel, and (2) good faith reliance on counsel's advice." *United States v. Lindo*, 18 F.3d 353, 356 (6th Cir. 1994) (emphasis added). "[A] defendant who identifies any evidence supporting the conclusion that he or she has fully disclosed all pertinent facts to counsel, and that he or she has relied in good faith on counsel's advice, is entitled to a reliance jury instruction." *Id.* Conversely, "it is well established that an instruction should not be given if it lacks evidentiary support or is based upon mere suspicion or speculation." *Id.*; *see also United States v. Morgan*, 216 F.3d 557, 566 (6th Cir. 2000) ("A district court must grant an instruction on the defendant's theory of the case if the theory has some support in the evidence and the law.") (citations omitted).

In the present case, Bruner's appeal of the advice-of-counsel instruction issue is limited to her bankruptcy-fraud and subsequent money-laundering convictions.[2] Accordingly, the question before us is whether the district court correctly found Bruner had not adduced sufficient evidence that she fully disclosed all the relevant facts to her attorneys and relied in good faith on her attorneys' advice, and therefore did not "knowingly and fraudulently make[] a false declaration, certificate, verification, or statement under penalty of perjury" during her bankruptcy proceedings. 18 U.S.C. § 152(3).

We find that Bruner failed to demonstrate a sufficient foundation in the evidence to merit an advice-of-counsel jury instruction. As the district court aptly explained in denying Bruner's motion for new trial:

> Bruner's argument for an advice of counsel instruction is complicated in that she insists she relied on a patchwork of advice from two separate attorneys who worked on two very different matters several years apart. The factual applicability of an advice of counsel defense is further obscured by the fact that

---

[2] This is in contrast to the arguments Bruner made in her motion for new trial, where she argued that all of her convictions should be vacated and a new trial ordered.

> Bruner was charged with several separate crimes. In her motion, Bruner lumps her arguments together, as though she had only one attorney and was charged with only one crime. In her motion, she insists, "The trial transcript contains a plethora of support for both required elements to merit the advice to [sic] counsel instruction." Bruner's argument is misplaced. Bruner failed to present any evidence at trial to establish either element of the advice of counsel instruction as to any particular charge.

*Bruner*, 2014 WL 2921840, at *2 (citation omitted).

Bruner improperly conflates the advice she received from Legg with the advice she received from O'Malley. Bruner implicitly argues that she established the two elements of an advice-of-counsel instruction by cobbling together her interactions—over the course of at least a decade—with Legg and O'Malley. Stated differently, Bruner claims the first prong of an advice-of-counsel defense is satisfied because she fully disclosed all pertinent facts regarding her financial assets to Legg, and the second prong is satisfied because she relied in good faith on the advice of O'Malley during her subsequent bankruptcy proceedings. Bruner cites no authority, however, establishing that an advice-of-counsel instruction is warranted on facts such these: where one attorney—in one legal context—gives a defendant certain legal advice, and then a second attorney—years later, unaware of the advice of the previous attorney, and in a very different legal context—gives a defendant other legal advice.

Legg's uncontroverted testimony was that he was not involved in Bruner's bankruptcy proceedings, and was not even aware that Bruner had filed for bankruptcy until after the fact. Indeed, in contradiction to Bruner's defense, Legg explicitly testified that Bruner told him that she had relied on advice from her bankruptcy lawyer in filling out the intake packet, which formed the basis of her bankruptcy petition. Accordingly, Legg's testimony is that Bruner *did not* rely on Legg's advice in completing O'Malley's intake packet. To the extent Bruner claims that she, in good faith, misapplied Legg's trusts-and-estates advice to the bankruptcy context, this argument is unpersuasive; Legg testified that he advised Bruner that "[t]he IRS considers

[the trust property] her property" for tax purposes, and that he "was not knowledgeable enough to know" whether Bruner's trust income needed to be reported as personal income or property to the Social Security Administration. This should have been sufficient to inform Bruner that Legg's trusts-and-estates advice was not readily generalizable to other legal contexts. *Cf. Lindo*, 18 F.3d at 356-57 (finding that, although the defendant had shown past reliance on counsel's advice, he had failed to provide evidence of full disclosure to counsel regarding the particular issue on appeal so as to be entitled to an advice-of-counsel instruction).

With respect to O'Malley, Bruner argues that (1) he advised her, during their initial meeting, that an irrevocable trust for the benefit of someone other than the debtor generally would not be deemed property of her bankruptcy estate, and (2) O'Malley's intake packet advised that Social Security income was not part of the bankruptcy estate. Based on this advice, Bruner argues, she excluded both her trust income and her Social Security income from her bankruptcy petition, thus justifying an advice-of-counsel instruction. There are several problems with this argument, however. First, even assuming O'Malley incorrectly advised Bruner regarding her trust and Social Security income, there were still other categories of income and assets that Bruner fraudulently excluded from her bankruptcy petition: namely, over $223,000 in cash found in her residence at 233 Stable Way, two other homes, and several vehicles. Thus, Bruner's non-disclosure to the bankruptcy court was not limited to her trusts or her Social Security income. Moreover, no evidence establishes that O'Malley provided Bruner any advice regarding these other categories of income and assets.

Second, there is ample room to question whether Bruner fully disclosed all pertinent facts regarding the trusts to O'Malley. O'Malley testified, unrebutted by Bruner, that Bruner asked him only a general question about a "trust that [was] held exclusively by her mother and sister"

and how it could be "impacted by her filing bankruptcy." In response to this general question, O'Malley "[t]old her that as a general principle of law, property held in an irrevocable trust for the benefit of someone other than the debtor would not be deemed property of her bankruptcy estate." A general, incomplete question that elicits only a general, incomplete response cannot constitute full disclosure sufficient to justify an advice-of-counsel instruction. *See United States v. Reesor*, 10 F. App'x 297, 308 (6th Cir. 2001). At no point did Bruner give the trust documents to O'Malley. Further, O'Malley testified that if Bruner *had* told him that "she had access to the money in the corpus of the trust," he would have advised her that the trust property "would have been property of the bankruptcy estate because the debtor would have an interest."

Third, Bruner suggests on appeal that O'Malley is at fault because he did not ask Bruner sufficient questions or ask for relevant documents prior to Bruner completing O'Malley's intake packet or prior to O'Malley filing Bruner's bankruptcy petition. For instance, Bruner notes that O'Malley did not request to see the trust documents and did not provide Bruner with adequate guidance in completing the intake packet. Bruner further suggests that the directions in the intake packet were misleading. These arguments, however, only serve to undermine Bruner's advice-of-counsel defense. Regardless of whose position one accepts—*i.e.*, whether Bruner consciously omitted relevant information in her interactions with O'Malley prior to the filing of her bankruptcy petition (the government's theory) or O'Malley did not make sufficient inquiries to allow Bruner to accurately answer the questions in the intake packet (Bruner's theory)—the end result is the same: Bruner did not disclose all pertinent facts to O'Malley. In the absence of full disclosure, Bruner cannot credibly claim to have relied in good faith on O'Malley's advice.

IV.

- 11 -

For the foregoing reasons, Bruner's judgment of conviction is **AFFIRMED**.